**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| **FELIPE "TRES" BARRERA III** | § | |
| **Individually and on behalf of all those** | § | |
| **similarly situated.** | § | **CAUSE NO.** |
| *Plaintiffs,* | § | |
| **v.** | § | |
| | § | |
| | § | |
| **MAJOR LEAGUE BASEBALL;** | § | |
| **OFFICE OF THE COMMISSIONER** | § | |
| **OF BASEBALL d/b/a MAJOR LEAGUE** | § | |
| **BASEBALL' DR. DANIEL EICHNER;** | § | **JURY DEMANDED** |
| **SPORTS MEDICINE RESEARCH AND** | § | |
| **TESTING LABORATORY; and** | § | |
| **LABORATOIRE DE CONTROLE** | § | |
| **DU DOPAGE** | § | |
| *Defendants.* | § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR AN EMERGENCY**
**TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF**

---

**NOW COMES**, Plaintiff Felipe "Tres" Barrera III (hereinafter referred to as "Mr. Barrera"

or "Plaintiff") files this Original Complaint and Application for Emergency Injunctive Relief

against Major League Baseball, The Office of the Commissioner of Baseball, Dr. Daniel Eichner,

Sports Medicine Research and Testing Laboratory, and Laboratoire de Controle du Dopage

(hereinafter referred to as "Defendants" or "MLB" or "Dr. Eichner" or "SMRTL" or "Montreal

Laboratory) and will show the following:

**<u>INTRODUCTION</u>**

1.      Plaintiff files this class action against the MLB, The Office of the Commissioner of

Baseball, Dr. Daniel Eichner, SMRTL, and the Montreal Laboratory, and asserts causes of action

to vacate an arbitration award against Plaintiff based on a diversion from the MLB's Joint Drug Prevention and Treatment Program ("JDA") and Collective Bargaining Agreement ("CBA"), and claims for common law fraud, misrepresentation, and negligence for proximately causing Plaintiff and similarly situated players to suffer damages based on unreliable testing and "junk science[1]" for detection of Turinabol.

2.      While the intended purpose of the JDA is to prevent a player from gaining an unfair advantage by using performance enhancing drugs while subject to the JDA, the JDA **also** requires the MLB to provide and produce accurate and reliable tests for certain prohibited substances.

3.      It was **not meant** to deprive Plaintiff from his rights, ability to make living, or to impugn his reputation and the reputation of others that have had to deal with inaccurate and unreliable testing.

4.      Plaintiff has now been unlawfully suspended for a minimum of 80-games a significant portion of a Plaintiff's career, particularly given the current, pandemic shortened season, and the fact that Plaintiff recently was set to make a 30-man roster.

5.      The JDA does not punish players who test positive for performance enhancing drugs prior to employment (which could stem from a performance enhancing drug several years earlier, regardless of whether the injection of the substance was known or unknown by the player to have been injected).

---

[1] Plaintiff's use of the phrase "junk science" throughout this complaint refers to the difficulty in test determining where the M3 metabolite is sequestered in the body because it is unethical and illegal to do an excretion study for the Dehydrochlormethyltestosterone ("DHCMT"), commonly known as Oral Turinabol on humans. As a result, there are no controlled studies involving humans that address where the M3 metabolite is sequestered in the body or how long it can stay in a person's body. The evidence is all theoretical, yet the evidence has caused MLB players to suffer damages based on unreliable theories and inaccurate testing. This theoretical "junk science" has caused many innocent players' careers to be tainted.

6.      Moreover, under Section 8(B)(3) of the JDA, a supposedly "positive" test result cannot serve as the basis for discipline under the JDA if objective evidence calls into question either the accuracy or the reliability of the result at issue.

7.      The purpose of the JDA is to deter the use of specific prohibited substances that give players an unfair advantage, ultimately affecting the integrity of the game. The JDA requires the MLB, through its chosen agents, to conduct accurate and reliable testing for all performance enhancing substances.

8.      As explained in detail below, the objective scientific evidence shows that Plaintiff's exposure to the substance may well have occurred pre-employment, and that **Plaintiff Barrera's exposure was so minimally low that it did not—*and could not*—have provided him with any performance enhancing benefit whatsoever.**

9.      Moreover, testimony given by Defendant Dr. Eichner has left a plethora of uncertainty as to the reliability of the tests for Dehydrochlormethyltestosterone ("DHCMT"), commonly known as Oral Turinabol. To this day, Defendant Eichner has not—and cannot—state that Barrera received any performance enhancing benefit, nor can he, or has he, state(d) that the current testing for Turinabol is reliable as to cause or timing.  Even further, Defendant Eichner is well aware that other non-prohibited substances can mimic the same metabolite created by DHCMT.  Yet, Defendant Eichner continues to peddle "junk science" for the benefit of MLB—the entity that pays him quite well to do so.

10.     Plaintiff has exhausted his contractual remedies under the JDA and the CBA, and after the Arbitration Panel awarded an eighty (80) game suspension, Plaintiff was forced to file this suit to protect his rights based on an Arbitration Award that has deviated from the current JDA and CBA.

See Exhibit "A" (filed under seal in an abundance of caution as to not disturb MLB's preference that arbitration awards remain "confidential").

11.    Plaintiff brings this action to set aside and vacate the Arbitration Award dated July 24, 2020, rendered by Mr. Mark L. Irvings, Chair of the Arbitration Panel.  *See Id.*

12.    The Arbitration Award effectually suspended Plaintiff for a minimum of eighty (80) games during the 2020 MLB season, and possibly into the 2021 season.

13.    The Arbitration Award is null and void because it violates Plaintiff's rights under the JDA and CBA, since the Arbitrator wholly ignored, and did not properly consider, the irrefutable evidence in the record, which clearly demonstrates a deviation from the JDA and CBA given that the test is clearly unreliable—even to a casual observer.  The process is clearly a sham.

14.    The Arbitrator's reasoning was based on testimony presented by Dr. Eichner, which is so palpably faulty and contradictory, that no judge or trier of fact could ever conceivably have made such a ruling based on the objective evidence presented.

15.    Dr. Eichner has contradicted his findings on multiple occasions, during the last four years, causing Plaintiff and similarly situated players to suffer damages based on the theoretical "junk science" of DHCMT testing.

16.    Plaintiff is entitled to an Emergency Temporary Restraining Order and Injunction which will prohibit the Defendants, MLB, and the Office of the Commissioner of Baseball, and/or any of their employees, administrators, officers, agents, servants and workers, from carrying-out Plaintiff's 80-game suspension from the Major League Baseball season for the 2020 season, or otherwise interfering with his status as a member of the Washington Nationals Baseball team.

17.    Plaintiff's claims brought before this Court have merit because Defendants, collectively, violated the current JDA and CBA based on their deceptive, misleading and unprofessional

handling and adjudicating of Plaintiff's grievance with the MLB, which has caused him immediate and irreparable injury.

## JURISDICTION AND VENUE

18.     This case arises under 29 U.S.C. § 185. Section 301(a) of the Labor Management Relations Act (LMRA) provides in pertinent part: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." (29 U.S.C. 185(a).) Plaintiff further alleges that federal jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1337, and 29 U.S.C. § 185(c)(2). Accordingly, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. §185(c)(2).

19.     Venue proper in the Southern District of Texas - McAllen division. The underlying arbitration proceedings, which Plaintiff seeks to vacate and receive injunctive relief, took place, via Zoom, in McAllen, Texas.  MLB agreed to avail themselves to this District by conducting the arbitration, via Zoom, in the Southern District of Texas. Furthermore, Plaintiff resides within this judicial district and division because of Defendants' unlawful actions.

## PARTIES

20.     Plaintiff, Tres Barrera, is an individual residing in Texas.

21.     Defendant, Major League Baseball, is an unincorporated association whose members are the 30 Major League Baseball Clubs. MLB is headquartered at 245 Park Avenue, New York, New York, 10167.

22.     Defendant, Dr. Daniel Eichner, is a resident of Utah. Defendant through his testimony availed himself in all fifty states, and through Arbitration availed himself in the state of Texas. Defendant can be served at his place of business at 560 Arapeen Dr. Suite 150A, Salt Lake City, UT 84108-1293.

23.     Defendant, Sports Medicine Research and Testing Laboratory, is a foreign corporation that conducts business in the state of Utah. Defendant can be served through its Registered Agent at the following address: National Registered Agents, Inc. 1108 E SOUTH UNION AVENUE, Midvale, UT 84047.

24.     Defendant, Laboratoire de Controle du Dopage ("Montreal Laboratory"), is a foreign corporation located in Montreal, Canada. Montreal Laboratory is the primary lab that handles MLB drug testing. The Montreal Laboratory is a World Anti-Doping Agency accredited laboratory in Montreal, Canada. Montreal Laboratory handles all of the MLB's drug testing throughout all fifty states. Defendant can be served at: 490, rue de la Couronne Québec (Québec) G1K 9A9 Canada.

## FACTS

**Early Career of Felipe "Tres" Barrera**

25.     Plaintiff, Felipe "Tres" Barrera was born and raised in south Texas. He was a two-sport athlete in high school, playing both football and baseball. Starting in his junior year in high school, he began using nutritional supplements that he purchased from retail outlets, such as, GNC to build muscle. He received no education regarding such supplements, and he was unaware that they might contain contaminants such as steroids or other performance enhancing drugs ("PEDs") that were banned under sports anti-doping programs.

26.     After graduating high school in 2013, Plaintiff received an athletic scholarship to the University of Texas to play baseball.



27.     While at the University, Plaintiff attended programs for each of his three years regarding PEDs and supplements. Barrera regularly used protein powders provided for athletes by the University in the Nutrition Room.

28.     At some point during his college career he was subjected to urine testing, but he was unaware what the tests screened for and he was never informed he had tested positive. During the summers between his college seasons he played in the Cape Cod League. He was urine tested one time, one summer, and was never informed he had tested positive for any banned substance.

**Felipe "Tres" Barrera's Entry into Professional Baseball and Mandatory Drug Testing**

29.     In June 2016, Plaintiff was chosen as a catcher in the sixth round of the Amateur Draft by the Washington Nationals. Because he was not a top 300 prospect, he was not subject to the pre-employment drug testing program. He signed a Minor League Uniform Players Contract and was assigned to play in Auburn, New York. While there he received supplements from the club, but was not given any training regarding the Minor League Drug Program or the NSF Certified for Sports program.

30.     Plaintiff was drug tested for the first time under the Minor League Drug Program on August 11, 2016 and the result was negative. After the season ended in Auburn, Plaintiff was invited to

participate in an instructional league for top prospects at the Nationals' facility in Florida. It was there that Plaintiff actually received training regarding the Minor League Drug Program. The Minor League Drug Program is under the auspices of Major League Baseball and utilizes either the UCLA laboratory or the Sports Medicine Research and Testing Laboratory ("SMRTL") in Utah to tests the samples from Minor League players.

31.     The seven subsequent urine tests that were administered randomly to Plaintiff in the succeeding three seasons and off-seasons while he progressed through the Minor Leagues were all negative. In all of Plaintiff's tests, but the final one, Plaintiff's urine samples had a specific gravity of greater than 1.020, which meant that the samples were highly concentrated. The greater the concentration of a urine sample, the greater the ability to detect the presence of a banned substance, such as DHCMT.

The following flow chart represents Plaintiff's testing history:

| TESTING DATE | M3 Metabolite Result |
|---|---|
| August 11, 2016 | **NEGATIVE** |
| April 9, 2017 | **NEGATIVE** |
| October 2, 2017 | **NEGATIVE** |
| May 11, 2018 | **NEGATIVE** |
| October 23, 2018 | **NEGATIVE** |
| March 5, 2019 | **NEGATIVE** |
| March 25, 2019 | **NEGATIVE** |
| July 5, 2019 | **NEGATIVE** |
| January 4, 2020 | **POSITIVE – (10 picograms/ml)** |

32.     On July 16, 2016, the Office of the Commissioner of Baseball sent a memorandum to all Major and Minor League players regarding DHCMT, which put players on notice that DHCMT, or Oral Turinabol, was a prohibited substance and players were urged to use only nutritional supplements and products that have been certified under the NSF Certified for Sport program.

33.     At the conclusion of the AA season in September 2019, Plaintiff was awarded a roster spot on the Nationals 40-man roster and Plaintiff fulfilled a lifelong dream of debuting in a Major League game on September 14.

34.     Although he was not included on the team's postseason roster, unlike others who had been elevated at the end of the regular season the Nationals kept Plaintiff with the club. Plaintiff, therefore, got to be part of the Nationals successful march to the World Series Championship. Throughout his time with the Nationals he used supplements supplied by the club.

**Felipe "Tres" Barrera's Drug Test Sample Contained Very Low Levels of the M3 Metabolite**

35.     Plaintiff, who resided still in Texas, was notified on January 4, 2020 that he would be required to provide a urine sample on January 5. The next morning at 8:22 am, with his first urination of the day, and Plaintiff provided a sample. Defendant, Montreal Laboratory, tested sample of Plaintiff's urine specimen, which had a specific gravity reading of 1.025, meaning Plaintiff was dehydrated when the sample was produced. Defendant, Montreal Laboratory, found the sample contained the M3 long term metabolite of DHCMT at a level of 10 picograms per milliliter. A subsequent analysis of the B sample confirmed the finding.

36.     It should be noted that in other professional sports leagues, 100 picograms is not considered a "positive" test because the levels are so low that it does not have any performance enhancing effect.

37.   **10 picograms is 1/10th of the level that other major leagues in the United States would consider a negative test result**. MLB is aware of this.

38.   Around November 2018, Jeff Novitzky, a former federal law enforcement agent who led the federal 16 investigations into the BALCO scandal and Lance Armstrong, sent an e-mail to Jon Coyles, the attorney primarily responsible for the administration of the JDA, detailing his concerns about picogram-level DHCMT positives.

39.   At that time the MLB was on notice that athletes testing positive for low levels of DHCMT were being unfairly punished. The MLB received emails from various professional sports leagues[2] regarding the inefficiency and unreliability in DHCMT testing.

40.   Specifically, Mr. Novitzky was concerned about "low picograms level positives" being treated as intentional program violations when mounting evidence suggested that such positives stemmed from "unintentional exposure to small contaminants" that "would have no impact on performance and/or health and safety."

41.   As a result, Mr. Novitzky communicated to Mr. Coyles that UFC intended to adopt measures that were aimed at avoiding a scenario where an athlete testing positive at low levels of DHCMT would be unfairly treated as an intentional cheater – i.e., implementing a detection threshold for DHCMT that would treat positive tests results below a defined concentration level or threshold as "atypical findings" rather "anti-doping rule violations."

42.   On February 11, soon after arriving in Florida for spring training, Plaintiff was notified by MLB's general counsel of the positive finding for DHCMT. Consistent with the usual procedure

---

[2] It is known that MLBPA had discussions with the National Hockey League with issues regarding Turinabol. Issues are and have been widely known regarding the inherent issues with Turinabol testing. The Ultimate Fighting Championship ("UFC") sent also emails to the MLB's representatives to speak about the serious issues of DHCMT testing.

after a positive test when the player denies any intentional usage, Plaintiff was instructed to assemble any and everything he might have ingested or touched since his last negative test, and to send the materials to a laboratory for testing to see if something was contaminated with DHCMT.

43.     Over the following two weeks Plaintiff's parents retraced his steps in Texas and amassed 43 items. This included food in Plaintiff's house and from places like: Fit to Fork, smoothies from Tropical Smoothie, massage oil from ProSports, and supplements and medicines used by his parents and his wife. Eventually everything the parents sent to the laboratory was found to contain no DHCMT.

**Dr. Eichner's Role in DHCMT Testing and the Arbitration Hearing**

44.     Dr. Daniel Eichner is the President and Laboratory Director of SMRTL, a position he assumed after being the science director for USADA. Besides performing testing for the Minor League Drug Program, SMRTL performs similar services for the Ultimate Fighting Championship ("UFC") and numerous other groups.  Dr. Eichner was called previously by the UFC to provide testimony, regarding DHCMT and the M3 metabolite, in part of his previous testimony Dr. Eichner concluded:



C. **Dr. Daniel Eichner■ confirms that (1) there is no evidence that ▆▆▆▆ has reingested DHCMT and (2) it is extremely unlikely that ▆▆▆▆ will gain any advantage from the picogram levels detected *in his system***

28. In a witness statement requested by the UFC ▆▆▆▆▆▆▆▆, *Dr. Daniel Eichner made the following observations:*

    a. **Recent anti-doping matters have revealed that the urinary excretion profile of the M3 metabolite can be unusual and complex. Importantly, it is not possible to conduct the necessary administration studies in the US to further investigate the urinary excretion profile.**

    b. **The 7 ▆▆▆▆▆▆] samples collected between 2/14/2019 and 10/23/2019 all revealed no detectable levels of DHCMT or any of the known metabolites, short, interim or long-term.**

    c. **On 12/4/2019 and 1/06/2020 ~60 pg/mL of the M3 metabolite was detected in both samples. No other known metabolites were detected.**

    d. **There is no evidence that DHCMT has been re-administered or there has been reexposure.**

    e. **The most likely interpretation of these data is residual levels from a previous exposure.**

    f. **Given that the most likely interpretation of these data is residual from a previous exposure, it is extremely unlikely that the athlete would have an unfair advantage leading up to the competition or for a competition at the beginning of 2020.**

*See* Exhibit B.

45.    Dr. Eichner is under retainer to Major League Baseball, and is paid large amounts of money to serve as an expert and has testified on behalf of MLB in prior arbitrations under the JDA. As a result of his known perpetuation of unreliable science and testing issues, no player has ever been vindicated.

46.    Dr. Eichner is widely recognized as one of the world "experts" in this field, in particular regarding the behavior and detection of DHCMT, and claims he has seen more longitudinal testing histories of athletes than anyone else. SMRTL has also been designated as the laboratory to perform COVID-19 testing as part of the effort to resume the baseball season. Yet, during the Arbitration Panel hearing, when asked about the effects of DHCMT testing, Dr. Eichner created nothing but uncertainty around the test by continuously **stating he was unsure based on the lack**

**of science to support the findings**. How can it possibly be fair to any player tested? It is not, and no rational arbitration decision would possibly be held against a player based on this alone.

47.    Dr. Eichner was called as the only expert witness that testified in front of the Arbitration Panel regarding DHCMT and its detection. Dr. Eichner explained that the parent compound of DHCMT has a very short half-life and could be detected in a urine sample for only a few days. The parent compound, and a very short-lived metabolite, initially breaks down into what is variously called an intermediate, interim, or medium-term metabolite. He estimated that the intermediate metabolite is detectable in urine samples for "conservatively three weeks," although he acknowledged testifying in a legal proceeding in 2019 that it might last as long as three months. At some point in time the substance converts to a long-term metabolite, M3. In early 2020, Dr. Eichner is not sure whether or not it could be many years, yet he continues to falsely, and contradictorily, implicate innocent players and taint or even ruin their careers.

48.    In 2012, Doctors Sobelevsky and Volchenkov published a study concerning the identification of the M3 metabolite of DHCMT. No excretion study on humans had then, or since, been conducted. The authors only theorized, however, the M3 metabolite of DHCMT would be detectable for up to 50 days. Based on that paper and his own experience up to that time evaluating numerous drug testing histories, Dr. Eichner opined in front of the Arbitration Panel that M3 would only be detectable for a maximum period of 50 days after exposure.

49.    Dr. Eichner also has presented testing histories of a number of Minor League players whose samples were analyzed at SMRTL. The histories showed similar patterns of initial positive findings for M3 followed by multiple positive tests, sometimes interrupted by negative tests. For some, but not all, of the negative test results the laboratory records showed that trace amounts of M3 had been detected but at levels that did not meet the confirmation criteria for a positive test.

13

Dr. Eichner has stated trace amounts are more likely to be detected in concentrated samples, those with a specific gravity above 1.020. In each of these cases, it had been determined that the subsequent positive tests were residual findings from the first exposure.

50.     The essence of Dr. Eichner's expert testimony was that since around 2015 laboratories: (a) have been able to detect extremely low concentrations of M3; (b) the long-term metabolite of DHCMT appears to be highly unusual among oral-based steroids in that it can remain in the body and be excreted for years; and (c) the long-term metabolite can be sequestered in the body in a location that has not yet been found.

51.     The sequestration, per Dr. Eichner, means sometimes it is present in the urine and at other times no detectable amount is present. Yet, Dr. Eichner continues to offer MLB with conclusive statements that differ from what the science actually shows or even, what it does not show.

52.      Dr. Eichner has stated that it is unknown why M3 is excreted sometimes, but not other times, which is atypical behavior because it is impossible to tell when exposure occurred, and whether the exposure was a large or repeated amount a long time before, or a small amount more recently.

53.     Dr. Eichner's opinion in front of the Arbitration hearing was that Plaintiff was likely exposed between his last negative test in July 2019 and January 2020. He based this in part on the fact that the Association asked him to examine all of Plaintiff negative Minor League tests and he found no traces of M3 in any of them, despite the fact that most involved highly concentrated urine samples.

54.     There was no other evidence that pointed to an exposure before Plaintiff's first test. Dr. Eichner said that although he reviewed over 50 longitudinal histories involving DHCMT, he now

agrees that consistent or intermittent positive tests for M3 can be residual to an original exposure for at least three years.

55.     The Arbitration Panel made its decision based solely off the contradictory opinions of Dr. Eichner, and failed to take Plaintiff's objective evidence regarding the inaccuracy and unreliability of DHCMT testing into consideration.

56.     No other expert was called to testify in front of the Arbitration Panel to refute Dr. Eichner's theoretical evidence by the Major League Baseball Players' Association ("MLBPA"). Barrera did not have the ability, to independently, or otherwise, select or present an expert, under the JDA and CBA.

57.     No other "expert" was present at arbitration to present facts to refute the performance enhancing effect of low level picograms, which would ultimately prove that Plaintiff's low picograms had absolutely no performance enhancing effect and could stem from a bevy of non-prohibited causes or natural body secretions.

**Arbitration Panel Issued a Decision to Suspend Felipe "Tres" Barrera for Eighty (80) Games**

58.     After Defendant MLB issued its decision to suspend Plaintiff for eighty (80) games,

Plaintiff released the following statement:



After conducting an appeal process, I am saddened to confirm that I have failed a test under MLB's Joint Drug Agreement for DHCMT and the arbitrator has decided to uphold the suspension. From the initial failed drug test to losing the appeal, this all has come as a complete surprise as I have never, and will never knowingly use a banned substance. I have worked too hard and given too much to this sport to disrespect or cheat the game that I love. I would never do anything to dishonor my family, teammates, and coaches or do anything to let down the many young ball players that look up to me.

I apologize to the Nationals' organization, my teammates, fans, and my family for the negative attention this has brought. I will continue to work to find answers to the many questions that remain surrounding this drug to clear my name, but most importantly to prevent this from happening to anyone else. I look forward to returning to baseball and contributing to the team alongside my brothers.

God Bless,
Tres Barrera

*See* Exhibit C.

59.     T.J. Quinn, an investigative reporter for ESPN, and Jeff Novitzky[3], a well-known person

in anti-doping circles and the person responsible for running the drug testing program of the UFC,

chimed in on social media, with reference to DHCMT testing:



**Jeff Novitzky** ✔
@JeffNovitzkyUFC

Replying to @TJQuinnESPN and @TresBarrera13

There is something screwy with this
substance.  We have athletes with
small amounts of the DHCMT M3
metabolite in their systems for 2 and 3
years.  It's also "pulses"…comes and
goes.  We don't sanction any longer
under our program if <100 picograms.
Too many uncertainties.



**T.J. Quinn** ✔
@TJQuinnESPN

I'm as skeptical as anyone when an
athlete says "I have no idea how this
got in my system." But here's why
@TresBarrera13's suspension leaves
some room for doubt. The drug found
in his system is Turinabol, which is as
old-school as they get. (It was popular
in East Germany.) 1

_____

[3] Jeff Novitzky was prominent in changing the threshold requirements of low picograms levels for positive tests in the
UFC. Novitzky noted that DHCMT testing has become so sensitive that the UFC needed to create test levels to insure
only intentional users were exposed, and not low level picograms, which would not have any impact on an athlete's
performance.



**T.J. Quinn** ✔
@TJQuinnESPN

A knowledgeable doper wouldn't take it. There are too many modern options that leave the system within days. Could it have come from a supplement? Maybe, but right now USADA has only one Turinabol–tainted product on its "high risk" list, which is subtly called "Turinabol 10." 2



**T.J. Quinn** ✔
@TJQuinnESPN

The testing technology changed in recent years, making Turinabol easier to detect at far lower levels and for longer than had been the case. Great little footnote: the person who developed the more sensitive test is Grigory Rodchenkov. 4

*See* Exhibit D.

**The JDA Requires Accurate and Reliable Testing for Prohibited Substances**

60.     Given the great number of uncertainties, and the "junk science" regarding the accuracy of the test, it is entirely possible that Plaintiff was exposed to DHCMT before he was drafted and signed a Minor League contract.

61.     Plaintiff used supplements while in high school and college, and was not aware of the risk of contamination with DHCMT. A month after he signed his contract, the MLB issued its warning to all Major and Minor League players that numerous commercially available supplements had been found to be contaminated and advised that they only use NSF-certified products. If a supplement Plaintiff had ingested was contaminated, Plaintiff could have theoretically tested negative eight times over almost four years, **and still carry** the M3 metabolite in his body.

62.     The premise of the JDA is that players are subject to discipline if they ingest a Prohibited Substance while subject to the JDA. It is consistent with fundamental labor relations concepts that people must have notice of a rule before it can be enforced against them. Obviously, Plaintiff was not covered by the JDA when he was in high school and college, and he did not have the benefit of notice nor essential educational programs.

63.     Given the strict liability system under the JDA, the inability of the test to accurately determine that Plaintiff's exposure to DHCMT occurred while he was subject to the program is unreliable.

64.     DHCMT is a unique and anomalous substance, yet the MLB is trying to impose an 80-game suspension on a player who may well have had an inadvertent exposure to DHCMT before he was subject to any MLB drug program, in breach of the JDA and CBA. Furthermore, the low picogram levels indicate that the substance found would not have any performance enhancing effect, which is the purpose of the JDA to ensure the integrity of the game.

65.     DHCMT is unlike every other oral-based steroid. It can remain in a person's body for periods of four years and possibly longer, something Dr. Eichner publicly acknowledged in his testimony in a case in February 2020. It is not excreted on a steady pace and in fact can remain sequestered for extended periods of time. Numerous negative test results, even without any

evidence of trace amounts, can be interspersed with positive results, all of which have been determined to be **residual** from the initial exposure.

66. The Arbitration Panel determined Plaintiff failed to satisfy his burden to prove the test for the M3 metabolite is unreliable or inaccurate, yet the Arbitration Panel concluded there was not enough evidence to prove otherwise based on the longitudinal testing histories of other athletes.

67. Plaintiff now seeks relief from this Court based on the actions by Defendants that led to his eighty (80) game suspension. Plaintiff is requesting an emergency temporary restraining order and injunction to enjoin the MLB from enforcing the eighty (80) suspension based on the fact that Plaintiff's due process rights have been violated, and Defendants' have caused Plaintiff to suffer irreparable harm.

## CLASS ACTION ALLEGATIONS

68. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action as a class action on behalf of himself and all members of the following Class of similarly situated persons and entities:

> Any Major or Minor League Baseball player, bound to the JDA and the CBA, who was suspended by Major League Baseball based on a positive test for the prohibited substance Dehydrochlormethyltestosterone ("DHCMT") or Oral Turinabol since MLB began testing for Turinabol.

69. On information and belief, the proposed Class consists of other professional baseball players, the joinder of which in one action is impracticable.

70. Defendants, collectively, violated the rights and interests of each Class Member in the same manner by their above-described uniform wrongful actions—to wit, wrongfully and knowingly misrepresenting to Plaintiff and Class Members that the accuracy and reliability of the DHCMT

test was in a timely, fair and impartial fashion, even though objective evidence proves those tests to be unreliable.

71.    Plaintiff Barrera's hard-earned reputation and the hard-earned reputation of other players similarly situated have been tainted by the acts of Defendants.

72.    Common questions of law and fact predominate over any questions affecting individual Class Members including, inter alia:

> i.    whether Defendants' above-described wrongful actions constitute a violation of due process rights;
>
> ii.    whether Defendants' above-described wrongful actions constitute fraud;
>
> iii.    whether Defendants' above-described wrongful actions constitute breach of fiduciary duties;
>
> iv.    whether Defendant's above-described wrongful actions directly or proximately caused Plaintiffs and Class Members to suffer damages; and
>
> v.    whether Plaintiffs and Class Members are entitled to recover actual damages, consequential damages, punitive damages, treble damages, pre- and post- judgment interest, attorneys' fees, litigation expenses, and court costs and, if so, the amount of the recovery.

73.    Plaintiffs' claims are typical of Class Members' claims because Plaintiff and Class Members are all victims of Defendant's above-described wrongful actions. Plaintiffs and its counsel will fairly and adequately represent the interests of Class Members. Plaintiff has no interests antagonistic to, or in conflict with, those of any of the Class Members. Plaintiffs' counsel is experienced in leading and prosecuting class actions and complex commercial litigation.

74.    A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiffs' and Class Members' claims. Plaintiffs and Class Members have been harmed as a direct and proximate result of Defendant's above-described wrongful actions. Litigating this case as a class action is appropriate because (i) it will avoid a multiplicity of suits

and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all Class Members to intervene as parties in this action, (iii) it will allow numerous persons with claims too small to adjudicate on an individual basis because of prohibitive litigation costs to obtain redress for their injuries, and (iv) it will provide court oversight of the claims process once Defendant's liability is adjudicated.

75.     Certification, therefore, is appropriate under F.R.C.P Rule 23, because the above described common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Defendant will retain the benefits of its wrongdoing despite violating the law and inflicting substantial damages on Plaintiffs and Class Members.

## COLLECTIVE BARGANING AGREEMENT AND THE "JDA"

76.     The MLB and the Players Association negotiated their Joint Drug Prevention and Treatment Program ("JDA" or the "Program"). The JDA applies to:

> The Program covers: (i) all Players on the Major League Clubs' 40-man rosters; (ii) any Player who becomes a free agent under Article XIX or Article XX of the Basic Agreement; (iii) any Player who is released from a Major League roster unless the player voluntarily retires or signs a Minor League contract or a contract with a club in an unaffiliated professional baseball league; and (iv) Foreign Professionals and Certain Free Agents, as specified in Attachments 3 and 4 of the Program.

77.     The purpose and coverage of the Program was set forth in the introductory paragraph:

> ". . . to (i) educate Players on the risks associated with the use of Prohibited Substances (defined in Section 2 below); (ii) deter and end the use of Prohibited Substances by Players; and (iii) provide for, in keeping with the overall purposes of the Program, an orderly, systematic, and cooperative resolution of any disputes that may arise concerning the existence, interpretation, or application of this Program. Except as otherwise provided herein, any dispute arising under the

Program shall be subject to resolution through the Grievance Procedure of the Basic Agreement. The Program covers: (i) all Players on the Major League Clubs' 40-man rosters; (ii) any Player who becomes a free agent under Article XIX or Article XX of the Basic Agreement; (iii) any Player who is released from a Major League roster unless the Player voluntarily retires or signs a Minor League contract or a contract with a club in an unaffiliated professional baseball league; and (iv) Foreign Professionals and Certain Free Agents, as specified in Attachments 3 and 4 to the Program ("Players")."

78.     Section 8(B)(3) of the JDA states:

3. **Affirmative Defense**: A Player is not in violation of the Program if the presence of the Prohibited Substance in his test result was not due to his fault or negligence. The Player has the burden of establishing this defense. A Player cannot satisfy his burden by merely denying that he intentionally used a Prohibited Substance; the Player must provide objective evidence in support of his denial. **Among other things, such objective evidence may question the *accuracy or reliability* of the "positive" test result**. Emphasis added.

79.     The parties jointly select the people and organizations who fill the necessary roles under the JDA. The Independent Program Administrator ("IPA") is generally responsible for overseeing the implementation of the collection and testing procedures. The current IPA is Thomas Martin. Comprehensive Drug Testing, Inc. ("CDT") randomly selects the players from whom urine and blood samples are collected both in-season and out-of-season, and effectuates the transportation of the samples to the World Anti-Doping Agency certified laboratory known as Laboratoire de Controle du Dopage (INRS – Institut Armand-Frappier) in Montreal, Quebec, Canada (the "Montreal Laboratory"). The director of the Montreal Laboratory is Dr. Christiane Ayotte, and she is designated as the Medical Testing Officer ("MTO"). The MTO oversees the testing of all collected samples and ". . .shall also make the determinations called for in Section 3.H of the Program and, by notification to the IPA, shall advise on other scientific issues associated with the testing required by the Program . . ." Section 3.H provides:

"Players shall not be subjected to multiple disciplines as a result of the same use of a Prohibited Substance. Whenever a Player alleges that a positive test result under the Program is the result of the same use of a Prohibited Substance that produced a prior positive test result (under either this Program or Major League Baseball's Minor League Drug Prevention and Treatment Program, (the "Minor League Drug Program")1 , the IPA shall refer the matter to the Medical Testing Officer for a determination as to whether, in the Medical Testing Officer's opinion, the subsequent positive test result was from the same use. The Medical Testing Officer should treat the subsequent positive test as resulting from a separate use of a Prohibited Substance only if she concludes with reasonable certainty that it was not from the same use of that substance that caused the initial positive test. (See Section 8.C.1(b) below.)"

80.     Section 7 of the JDA, titled "DISCIPLINE" states:

**Performance Enhancing Substance Violations**: A Player who tests positive for a Performance Enhancing Substance will be subject to the discipline set forth below. For purposes of this Section 7.A, a prior violation of Section 7.E, 7.F, and/or 7.G.2 involving a Performance Enhancing Substance that results in at least a 40-game suspension shall be deemed a prior violation of Section 7.A in determining whether the positive test constitutes the Player's first, second or third violation of Section 7.A.

      1. First violation: 80-game suspension;

      2. Second violation: 162-game/183-days of pay suspension; and

      3. Third violation: Permanent suspension from Major League and Minor League Baseball; provided, however, that a Player so suspended may apply, no earlier than one (1) year following the imposition of the suspension, to the Commissioner for discretionary reinstatement after a minimum period of two (2) years. The Commissioner shall hear any such reinstatement application within thirty (30) days of its filing and shall issue his determination within thirty (30) days of the closing of the application hearing. A Player may challenge the Commissioner's determination on such application under the Grievance Procedure set forth in Article XI of the Basic Agreement and any such challenge may include a claim that a suspension beyond two (2) years would not be for just cause; provided, however, that the Arbitration Panel shall have no authority to reduce any suspension imposed pursuant to this Section 7.A.3 to a period of less than two (2) years. Notwithstanding anything to the contrary elsewhere in the Program, any Player who is permanently suspended pursuant to this Section 7.A.3 is prohibited from attending Spring Training or entering Club facilities during his permanent suspension.

## EXHAUSTION OF CONTRACTUAL REMEDIES

81.     Courts have held: "[o]rdinarily . . ., an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement" before filing suit in court. (*quoting DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163, (1983)); *Dougherty*, 902 F.2d at 203 (holding that "[b]efore bringing such an action, the employee must exhaust grievance procedures provided by the relevant collective bargaining agreement") (*citing Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563 (1976)).

82.     Here, Plaintiff's claim is ripe because he has fully exhausted his contractual remedies by filing a grievance and appeal with the MLB Arbitration Panel.

## STANDARD OF REVIEW FOR VACATING AN ARBITRATION AWARD

83.     This Court has jurisdiction to review this arbitration proceeding pursuant to 29 U.S.C. § 185. However, the Court's review is extremely limited in its scope. *See Delta Queen Steamboat Co. v. District 2, Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 604 (5th Cir.1989). The Court will not vacate an arbitration award as long as the award "draws its essence from the collective bargaining agreement" and is not based on the arbitrator's "own brand of industrial justice." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). "In applying the 'essence' test, we have declared that an arbitrator's award 'must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement.'" *Houston Lighting & Power Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 66*,

71 F.3d 179, 183 (5th Cir.1995) (*quoting Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1325 (5th Cir.1994)).

84.      In crafting an arbitration award, an arbitrator may look for guidance from many sources so long as the collective bargaining agreement serves as the foundation of his award. *Enterprise Wheel*, 363 U.S. at 597. However, this Court is charged with a duty "to scrutinize the award to ensure that the arbitrator acted in conformity with the jurisdictional prerequisites of the collective bargaining agreement." *Delta Queen*, 889 F.2d at 602.

85.      Vacating an award is the appropriate remedy if an arbitrator exceeds the contractual authority granted to him by the collective bargaining agreement. 9 U.S.C. § 10(a). "[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end." *Delta Queen*, 889 F.2d at 602. Specifically, this Court will vacate an arbitration award that is contrary to the express and plain language of the collective bargaining agreement. *See Gulf Coast Indus. Workers v. Exxon Chem. Americas*, 863 F.Supp. 423, 426 (S.D.Tex.1994) (citing *Interstate Brands Corp., Butternut Bread Div. v. Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135*, 909 F.2d 885, 889 (6th Cir.1990)).

## <u>ARGUMENT AND AUTHORITIES</u>

### COUNT 1 – VACATING THE ARBITRATION AWARD AGAINST DEFENDANT MLB

86.      Plaintiffs reassert and incorporate all allegations set forth herein.

87.      An arbitrator's award may be vacated if it fails to draw its essence from the parties' agreement. Courts are free to scrutinize the award to determine if an arbitrator exceeded his contractual authority and, if so, then modify or vacate the award as the appropriate remedy. *See*

*Delta Queen Steamboat Co. v. District 2 Marine Engineers Beneficial Ass'n, AFL-CIO*, 889 F.2d 599 (C.A.5th 1989).

88.     The Arbitration Award in this case should be vacated for two distinct reasons: Plaintiff was denied due process and a full and fair hearing; and the Arbitration Panel exceeded their powers by **rendering an irrational decision**.

89.     The Arbitration Panel failed to give Plaintiff a full and fair hearing before rendering a decision, therefore, the Arbitration Panel exceeded their powers, and Plaintiff's request to Vacate the Award must be granted in order to remedy the damage Defendants have caused to Plaintiff.

90.     Accordingly, Plaintiff had no opportunity under the JDA and CBA to independently to present expert testimony at Arbitration to rebut the false, nonsensible, and contradictory testimony of Defendant, Dr. Eichner.

91.     Under both federal and state law, an arbitration panel must give a full and fair hearing to all parties. Failure to do so is grounds to vacate an arbitration award as either a violation of due process or a violation of specific statutory constraints. *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 19-20 (2d Cir. 1997) (vacating arbitration award pursuant where arbitration panel refused to hear pertinent testimony); *Coty, Inc. v. Anchor Construction, Inc.*, 2003 WL 139551 (N.Y.Sup. 2003) aff'd 776 N.Y.S.2d 795 (N.Y. App. Div. 2004) (vacating arbitration award for failure to provide a full and fair hearing).

92.     Dr. Eichner agreed that DHCMT could be sequestered in the body, causing low levels of M3 to appear, **even after three years of exposure,** yet still testified that Plaintiff is mysteriously and somehow a "doper."

93.     The DHCMT testing is based in totality on theory and "junk science", without any conclusive evidence, the low levels of picograms found in Plaintiff's system is known to not have

any performance enhancing effects. The purpose of the JDA is to deter and end the use of Prohibited Substances, and **just as importantly**, to provide **reliable and accurate** testing for each Prohibited Substance. Yet the overarching evidence points to the unreliability of DHCMT tests, and how low picograms levels are not considered "performance enhancing."

94.     The Arbitration Panel exceeded its authority in issuing the Award suspending Plaintiff because the evidence presented proved Plaintiff's low level of picograms would not be "performance enhancing," and the test was not accurate or reliable.

95.     The Arbitration Panel acted within its "own brand of justice" by confirming the contradictory evidence, instead of defining "performance enhancement," and not considering how the unreliability and inaccuracies in Plaintiff's positive test violated the JDA.

96.     Since the 2016 Memorandum, the MLB has failed to create any testing DHCMT thresholds that would distinguish actual performance enhancing levels, from low levels, which do not have any performance enhancing effect, despite being on notice of the effects of DHCMT testing. The MLB had notice from all over the place, yet did nothing but use Dr. Eichner as a vessel to continue to promote the theoretical "junk science," **causing many innocent players' careers to be tainted, and even ruined**.

97.     Multiple MLB players have been found to have very low levels of DHCMT in their urine samples, the results have been reported as positive, and the MLB has imposed 80 game suspensions for the first violation. Players have sometimes appealed the suspension under Section 8.B.3 of the JDA, but no player has ever appealed the accuracy and reliability of the DHCMT test.

98.     Based on the contradictory evidence presented to the Arbitration Panel, and the fact that testing DHCMT is mainly theoretical and "junk science," we are requesting this Court to vacate

the Arbitration Award because it is contrary to the express and plain language of the JDA, and the Arbitration Panel exceeded its authority in issuing the Award.

**COUNT 2 – COMMON LAW FRAUD AGAINST DEFENDANTS MLB AND DR. EICHNER**

99.     Plaintiffs reassert and incorporate all allegations set forth herein.

100.    Defendants, collectively, led Plaintiff and similarly situated players to believe that DHCMT testing was reliable and accurate. Defendants, collectively, knowingly made false representations to Plaintiff and similarly situated players as to evidence of DHCMT testing. Defendants, collectively, knew M3 is excreted sometimes, but not other times, in urine tests, ultimately making the DHCMT test unreliable and inaccurate.

101.    Despite being aware of the unreliability and inaccuracies of DHCMT testing, no Defendant did anything to remedy this major issue. Instead, all Defendants continued to perpetuate this fraud against Plaintiff and all other similarly situated players.

102.    Defendants, collectively, failed to represent the interests of Plaintiff and similarly situated players. Defendants, collectively, led Plaintiffs and similarly situated players to believe that the DHCMT test was accurate and reliable, when contradictory evidence exists to prove that it is not.

103.    Plaintiffs and similarly situated players would not have been suspended for violating the JDA, but for representations from Defendants that DHCMT tests were accurate and reliable. Plaintiffs and similarly situated players did not receive notice of the inaccurate testing only to find out later that DHCMT testing was unreliable after the MLB implemented the suspension.

104.    Defendant, Dr. Eichner, engaged in fraudulent misrepresentations by making contradictory and knowingly false testimony. Dr. Eichner's statements that Plaintiff was more likely to be

exposed to DHCMT between July 2019 and January 2020, was based on science he knew to be "junk science."

105.    Dr. Eichner confirmed that it was possible for Plaintiff to have been exposed prior to signing the JDA, yet his past testimony to the UFC contradicted the testimony he made in front of the MLB Arbitration Panel, which caused damage to Plaintiff and similarly situated players.

106.    As a result of relying on Defendants' collective representations that DHCMT testing was reliable, Plaintiffs and similarly situated players have been damaged in an amount within the jurisdictional limits of the Court.

## COUNT 3 – STATUTORY FRAUD UNDER TEXAS LAW AGAINST DEFENDANTS MLB AND DR. EICHNER AND SMRTL

107.    Plaintiff reasserts and incorporates all allegations set forth herein.

108.    The inaccurate and unreliable DHCMT test violates Section 27.01 of the Texas Business and Commerce Code and constitutes statutory fraud because the MLB, and Dr. Eichner have made theoretical representations of a material fact which have not been confirmed, which caused Plaintiff and similarly situated players to agree to the JDA, which caused injury to Plaintiff and similarly situated players because they were suspended based on evidence that has only been theorized and not proven.

109.    Defendants, Dr. Eichner, SMRTL, and MLB colluded to effectuate this fraud against Plaintiff and all other similarly situated players.

## COUNT 4 – COMMON LAW NEGLIGENCE AGAINST DEFENDANTS MLB, DR. EICHNER, SMRTL, AND MONTREAL LABORATORY

110.    Plaintiff reasserts and incorporates all allegations set forth herein.

111.    In the alternative, Defendants, collectively, were negligent in affirmatively stating that DHCMT testing was accurate and reliable. Defendants, collectively, owed a duty of care to

Plaintiff and similarly situated players, but breached that duty and made negligent misrepresentations that DHCMT testing was reliable and accurate.

112.     Defendants' collective breach of their duties owed to Plaintiff and similarly situated players proximately caused their damages, which are within the jurisdictional limits of the Court.

## APPLICATION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

**A.     PLAINTIFF IS ENTITLED TO AN EMERGENCY TEMPORARY RESTRAINIG ORDER AGAINST MLB BECAUSE PLAINTIFF FACES AN IMMEDIATE MINIMUM 80-GAME SUSPENSION**

113.     In addition, a temporary restraining order may be issued without notice to the adverse party if it clearly appears from specific facts shown by affidavit or by a verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required. FED. R. CIV. P. 65(b). Pursuant to FRCP 65(b) Plaintiff's attorney certifies in writing attempts to give notice to Patrick Houlihan, Chief Labor Counsel for the MLB. *See* Exhibit E. Plaintiff demonstrates through this verified complaint and evidence that he is entitled to immediate injunctive relief without notice to the Defendants.

**B.     PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION AGAINST MLB BECAUSE DEFENDANTS HAVE VIOLATED PLAINTIFF'S RIGHT TO PROCEDURAL DUE PROCESS WHICH HAS RESULTED IN IMMEDIATE AND IRREPERABLE HARM**

114.     Pursuant to Federal Rule of Civil Procedure 65, Plaintiff asks the Court to issue preliminary and permanent injunctions to enjoin the Defendant MLB from suspending Plaintiff for minimum eighty (80) games based on Defendant MLB's Arbitration Panel decision on July 24, 2020 and

reinstate Plaintiff back into the league while the lawsuit is pending, there will be irreparable harm if this is not granted since the season will be over while this is being adjudicated.

115.    Fed. R. Civ, P. 65(a)(1) states: "The court may issue a preliminary injunction only on notice to the adverse party. To obtain a preliminary injunction under Fed. R. Civ. R 65, the moving party must show: (1) a substantial likelihood of success on the merits; (2) Defendants' conduct presents a substantial threat that Plaintiffs will suffer irreparable injury absent the injunction; (3) this threatened injuries outweighs any harm the injunction might cause the Defendants; and (4) the injunction will not impair the public interest. *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc*., 342 F.3d 191, 196 (3d Cir. 2003).

116.    For the following reasons, Plaintiff has met his burden of proving all four requirements to obtain a preliminary injunction and respectfully requests this Honorable Court enter an Order which prohibits the Defendants, MLB, and/or any of their employees, administrators, officers, agents, servants and workers, from carrying-out the suspension of the Plaintiff for eighty (80) games effective July 24, 2020, or otherwise interfering with his status as a member in good standing on the Washington Nationals baseball team.

### 1.  LIKELIHOOD OF SUCCESS ON THE MERITS

117.    Plaintiff has a strong likelihood of success on the merits. Plaintiff has a constitutionally protected property and liberty interests as set forth above. The risk of erroneous deprivation of such interests in violation of Plaintiff's due process rights is certain to continue so long as the Arbitrator's Order to suspend Plaintiff for the 2020 MLB season is in place.

118.    There is a strong interest in protecting Plaintiff from further deprivations of its constitutional rights because Defendant's conduct, if not abated, will cause Plaintiff loss of use of its property and ongoing financial hardship, up to and including losing out on a contract.

119.    Plaintiff requests a preliminary injunction and permanent injunction preventing Defendant MLB from proceeding with the Arbitration Panel decision to suspend Plaintiff for a minimum of eighty (80) games.

120.    As Plaintiff's complaint has described, his rights were violated after Defendants' deviation from the CBA and JDA, which Plaintiff will be able to show a substantial likelihood of success on the merits. Defendants, collectively, have conducted an Arbitration Panel hearing regarding Plaintiff's alleged violations of the JDA without providing him with accurate and reliable testing of the prohibited substance DHCMT, which was promised to him in the CBA and JDA.

121.    Plaintiff presented objective evidence that the test results were not reliable or accurate, yet the evidence was not rationally evaluated by the Arbitration Panel, which relied exclusively on their paid "expert," Defendant Dr. Eichner.

122.    Because Defendants, egregiously violated the JDA and CBA, Plaintiff has demonstrated a likelihood of his success on the merits in his civil action.

### 2.  IRREPERABLE HARM TO PLAINTIFF

123.    Absent an injunction, Plaintiff will suffer irreparable injury. The MLB's Arbitration Award on July 24, 2020, approved the suspension of Plaintiff from all major league play for eighty (80) games. The loss of constitutional freedoms for "even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Particularly in the context of a pre-deprivation due process violation, "no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972); *see also Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("Even if respondents' suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process").

124.     Monetary relief is insufficient as a matter of law. Plaintiff's ability to play the game he loves is at stake. **He may not receive another chance to play at a high-level, while this lawsuit is pending, if injunctive relief is not granted**. This already happened to countless others that are similarly situated.

125.     In the case at bar, if MLB is not enjoined from effectuating the minimum eighty (80) game baseball suspension, Plaintiff will continue to be irreparably harmed by being removed from the Washington Nationals 30 or 40-man roster, just after being on the verge of being selected for the roster for the 2020 season.

126.     Pat Houlihan, an agent of MLB, violated confidentiality and advised the Washington Nationals **not to select** Barrera, once Houlihan realized Barrera was going to make the 30-man roster, even though the Arbitrator Award had not even yet been finalized.

127.     Logically, given that Plaintiff has just entered the major leagues within the last year, he likely carries the burden into the future by other Major League Baseball organizations and scouts who are tracking his progress. Plaintiff's hard-earned reputation will continue to be tainted absent injunctive relief.

128.     Accordingly, because there is no adequate remedy at law, and is denied injunctive relief while this lawsuit is pending, due to the Arbitration Panel's clearly irrational and erroneous decision, Plaintiff has and will continue to suffer irreparable harm, based on the collective actions of the Defendants.

### 3. ABSENCE OF HARM TO DEFENDANT AND PUBLIC INTEREST FAVORS RELIEF

129.     An injunction will not significantly burden any of the Defendants' interests, but will instead serve and enhance the public's interests.  Nothing in the requested injunction inhibits Defendants'

to continue to operate their business, nor does it affect the integrity of their business. Defendant Dr. Eichner has already testified in the past that the low picogram amount is not enough to be considered "performance enhancing."

130.    Actually, Defendants would benefit from the issuance of a preliminary injunction because no other player has challenged the accuracy or reliability of the DHCMT test results.

131.    Plaintiff seeks to enforce his rights under the state and federal statutes, and the public interest favors the injunctive relief requested by Plaintiff. The public favors relief from private actors, such as the MLB, who is required to abide by the JDA and CBA, but also the procedural due process requirements as set forth in the Fifth and Fourteenth Amendments of the United States Constitution.

132.    For the reasons set forth herein, Plaintiff, respectfully requests this Honorable Court issue a preliminary injunction which prohibits Defendant MLB, and/or any of their employees, administrators, officers, agents, servants, and workers from carrying-out the suspension of Plaintiff for eighty (80) games during the 2020 MLB season, which interferes with his status as a member in good standing on Washington Nationals baseball team.

## RELIEF SOUGHT

133.    Plaintiff seeks an Order vacating the Arbitration Award from the MLB Arbitration panel, which suspends Plaintiff for a minimum of eighty (80) games.

134.    Plaintiff seeks a preliminary injunction to enjoin the MLB from suspending Plaintiff for a minimum of eighty (80) games, while this lawsuit is pending.

135.    Plaintiffs and Class Members seek exemplary damages against Defendants pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code. Exemplary damages are justified by

Defendant's malice and ill will demonstrated by their knowledge and assistance in the fraud committed against Plaintiff and similarly situated players.

136.     Plaintiffs and Class Members seek emotional distress damages against Defendants. Plaintiff alleges and avers that Defendants subjected Plaintiff to severe emotional distress through the Arbitration Award that Plaintiff and similarly situated players were suspended for violating the JDA, even though DHCMT tests were not accurate or reliable as required by the JDA.

137.     Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, Plaintiffs and similarly situated players are entitled to recover reasonable attorney's fees and costs in the prosecution of this action.

138.     Plaintiffs and similarly situated players should be granted judgment against Defendants for pre-judgment interest as provided by §302.002 of the Texas Finance Code, and post-judgment interest on the total amount of the judgment until paid at the maximum rate allowed by law, which is the interest rate published by the Consumer Credit Commissioner.

139.     Plaintiffs and similarly situated players be granted judgment against Defendants for all costs of court; and Plaintiff be granted such other and further relief, special or general, legal or equitable, to which Plaintiff may show itself to be justly entitled to receive.

140.     Plaintiffs and similarly situated players be granted judgment against Defendants for all relief allowed by federal statutes, including exemplary damages, compensatory, punitive damages, and attorneys' fees where applicable.

# **PRAYER**

141.    WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully pray that the Court VACATE the Arbitration decision, and permanently ENJOIN Defendant MLB from executed an eighty (80) game suspension against Plaintiff. Moreover, Plaintiff respectfully pray that the Defendants be cited to appear and answer, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants for the damages requested in excess of the minimum jurisdictional limits of the Court, together with prejudgment and post-judgment interest at the maximum rate allowed by law, attorney's fees, court costs and such further relief to which the Plaintiffs may be entitled to at law or in equity, whether pled or unpled.

Dated: July 27, 2020                                             Respectfully submitted,





Alfonso Kennard, Jr.
Texas Bar No. 24036888
S.D. ID 713316
Eddie Hodges Jr.
Texas Bar No. 24116523
S.D. ID. 3479748
Kennard Law, P.C.
2603 Augusta Dr., Suite 1450
Houston, Texas 77057
T: (713) 742-0900
F: (713) 742-0951
alfonso.kennard@kennardlaw.com
eddie.hodges@kennardlaw.com
**ATTORNEYS FOR PLAINTIFF**

JAIME PEÑA
State Bar No. 90001988
SD TX: 289815
PEÑA ALECZANDER
3900 N. 10TH ST STE 1050
McAllen, TEXAS 78501
Telephone: (956) 948-2221
Facsimile: (888) 422-6821
Email: jpena@penaaleczander.com
Robert Casas Steindel
3827 N. 10th Street, Suite 302
McAllen, Texas 78501
(956) 800-1137 Phone
(956) 800-1138 Fax
Rsteindel96@gmail.com
**LOCAL OF COUNSEL FOR PLAINTIFF**

### <u>VERIFICATION BY ATTORNEY ALFONSO KENNARD JR</u>.

My name is Alfonso Kennard Jr, and I am the lead counsel for Plaintiff Felipe "Tres" Barrera III. Pursuant to 28 U.S.C. § 1746, I verify and declare that the foregoing Original Complaint and Application for Emergency Temporary Restraining Order and Injunctive relief, contained above, that I am authorized to make the foregoing Original Complaint and Application for Emergency Temporary Restraining Order and Injunctive relief on behalf of Plaintiff Felipe "Tres" Barrera III, and that all factual statements contained in said document are true and correct within my personal knowledge. I verify and declare that an attempt to confer with the Chief Labor Counsel for the MLB was made on July 27, 2020. *See* Exhibit E. I declare under penalty of perjury that the foregoing is true and correct.

Executed in __Harris_____ County, State of __Texas__, on the _27th_ day of July, 2020.

By: _____

Alfonso Kennard Jr.